## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED PARCEL SERVICE, INC., | § | |
| UNITED PARCEL SERVICE CO., | § | |
| UNITED PARCEL SERVICE GENERAL | § | CIVIL ACTION NO. |
| SERVICES CO., and | § | |
| UPS WORLDWIDE FORWARDING, INC. | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | **JURY TRIAL DEMANDED** |
| v. | § | |
| | § | |
| SALMON, RICCHEZZA, SINGER & | § | |
| TURCHI LLP, JOHN E. SALMON, | § | |
| ESQUIRE, PHILIP J. MEYER, ESQUIRE | § | |
| and ZACHARY J. BALLARD, ESQUIRE, | § | |
| | § | |
| DEFENDANTS. | § | |

## COMPLAINT

For their Complaint, Plaintiffs United Parcel Service, Inc. ("UPS Inc."), United Parcel Service Co. ("UPS Co."), United Parcel Service General Services Co. ("UPS GS"), and UPS Worldwide Forwarding, Inc. ("UPS Worldwide") (collectively referred to herein as "UPS"), hereby state and allege as follows:

## PARTIES

1.      Plaintiff UPS Inc. is incorporated under the laws of the State of Ohio, with its principal place of business in the State of Georgia.  Its parent company is UPS Worldwide Forwarding, Inc. ("UPS Worldwide"), whose own parent company is United Parcel Service of America, Inc. ("UPS America").

2.      Plaintiff UPS Co. is incorporated under the laws of the State of Delaware, with its principal place of business in the State of Kentucky.  Its parent company is UPS America.

3.       Plaintiff UPS GS is incorporated under the laws of the State of Delaware, with its principal place of business in the State of Georgia.  Its parent company is UPS America.

4.       Plaintiff UPS Worldwide incorporated under the laws of the State of Delaware, with its principal place of business in the State of Georgia.  Its parent company is UPS America.

5. Defendant Salmon, Ricchezza, Singer & Turchi LLP (the "Salmon Firm"), is a limited liability partnership located in Philadelphia, Pennsylvania.  Upon information and belief, the Salmon Firm has four partners: John E. Salmon, a New Jersey citizen; Joseph A. Ricchezza, a New Jersey citizen; Stewart R. Singer, a Pennsylvania citizen; and Joseph L. Turchi, a New Jersey citizen.

6.       Defendant John E. Salmon, Esquire, is an adult individual and practicing attorney at the Salmon Firm.  Upon information and belief, Mr. Salmon is a citizen of the State of New Jersey.

7.       Defendant Zachary J. Ballard, Esquire, is an adult individual and practicing attorney at the Salmon Firm.  Upon information and belief, Mr. Ballard is a citizen of the Commonwealth of Pennsylvania.

8.       Defendant Philip J. Meyer, Esquire, is an adult individual and practicing attorney in an "of counsel" status at the Salmon Firm.  Upon information and belief, Mr. Meyer is a citizen of the Commonwealth of Pennsylvania.


## JURISDICTION AND VENUE

9.       This court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

10.     Venue is proper under 28 U.S.C.A. § 1391 in that this action has been brought within the judicial district in which the claim arose, and within which each Defendant resides or is subject to personal jurisdiction.

## THE UNDERLYING FACTS

11.     On and before December 21, 2007, Gary M. DeVaco ("DeVaco") and Kevin Waldron ("Waldron") were employed as mechanics for Air Transport International ("ATI").

12.     On and before December 21, 2007, DeVaco had specialized training with high-powered jet engines, had worked with numerous airlines since 1987, had worked almost exclusively at the Philadelphia International Airport since 1996, and had worked as an aircraft mechanic since 2004.

13.     DeVaco was promoted as an ATI "Mechanics Supervisor" in March 2007.

14.     On and before December 21, 2007, DeVaco had a "FAA airframe and power plant" license, as well as a Philadelphia International Airport blue "SIDA" badge.

15.     Under Philadelphia International Airport rules, a blue "SIDA" badge allowed the badge holder the highest level of access on airport grounds, and "unescorted access" to any location on the airport, including the UPS Ramp.

16.     On and before December 21, 2007, DeVaco was "taxi-qualified," in that he had been trained in and actually performed the tasks of powering on and taxiing aircraft.  DeVaco was familiar with jet engines like those used in a Boeing 747.

17.     On and before December 21, 2007, DeVaco had worked at the UPS Terminal, and the UPS Ramp at the Philadelphia International Airport.

18.     Before December 21, 2007, DeVaco had worked on the UPS Ramp for at least three consecutive days including December 18, 19 and 20.

19.     On December 21, 2007, DeVaco and Waldron arrived at the UPS Terminal at approximately 2:00 p.m. in the ATI Grumman truck.   DeVaco was driving.  Waldron was in the front passenger seat.

20.     The ATI Grumman truck was an older model "bread truck" not typically used for airline maintenance; it had an extended profile and a high center of gravity.

21.     DeVaco and Waldron drove to the UPS Building and backed the ATI Grumman truck against the railing of the UPS Building.

22.     On information and belief, after parking, DeVaco and Waldron left their ATI Grumman truck and went inside the UPS Building's "Break Room."

23.     Unknown to UPS, on December 21, 2007, the ATI Grumman truck contained thousands of pounds of poorly loaded and unsecured equipment including cylindrical metal nitrogen and oxygen tanks.

24.     On and before December 21, 2007, OSHA regulations, as well as Philadelphia International Airport regulations, required that nitrogen tanks like those in the ATI Grumman truck be secured at all times on any vehicle in transit on airport grounds, including the UPS Ramp.

25.     United States' Department of Transportation rules also require that nitrogen tanks, whether full or empty with residual gas, must be secured from movement during transportation.

26.     On December 21, 2007, at approximately 2:30 p.m., a UPS Boeing 747 aircraft (the "UPS 747") landed on an active runway, 27L/9R, at the Philadelphia International Airport.

4

27.     The UPS 747 was directed by Philadelphia International Airport Control Tower to taxi and proceed south of 27L/9R to the concrete loading area (the "UPS Ramp") located at the UPS Terminal.

28.     The UPS Ramp area is a "non-movement area" which is not governed by the Philadelphia International Airport control tower.

29.     The UPS 747 followed the "self-marshaling taxi line" that led it onto the UPS Ramp to a standard parking spot that was denoted by a painted yellow "T," and surrounded by a pre-staged UPS ground crew and several items of ground equipment.

30.     The UPS 747 was not the aircraft that DeVaco and Waldron were waiting to service.

31.     On information and belief, despite visual awareness that the UPS 747 was taxiing in their direction and knowledge that the UPS 747 produced jet blast, DeVaco and Waldron left the UPS Building and re-entered the ATI Grumman truck.

32.     Several UPS employees witnessed DeVaco and Waldron leave the UPS Building and re-enter the ATI Grumman truck as the UPS 747 approached the yellow "T" located on the UPS Ramp.

33.     After the UPS Ramp marshaller signaled the UPS 747 to finalize its approach at the yellow "T," the UPS 747 throttled up only two of the four engines, (number #1 and #4 engine) to edge into the yellow "T" parking spot.

34.     The small amount of thrust from the UPS 747, combined with the ATI Grumman truck's "bread truck" profile, caused the ATI Grumman truck to flip onto its side, and slide into a "K" loader where it came to stop.

35.     DeVaco was found inside the back of the ATI Grumman truck with a nitrogen tank on top of him.

36.     Waldron was in the driver seat of the ATI Grumman truck at the time of the accident.

37.     DeVaco sustained significant injuries; Waldron did not.

38.     The front of the ATI Grumman truck was found 113' from the "self-marshaling taxi line" of the UPS Ramp. The rear of the ATI Grumman truck was found approximately 14' from the railing of the UPS Building. And the ATI Grumman truck was found between complexes B2 and B3 of the UPS Ramp lodged against a "K-loader."


## THE UNDERLYING LAWSUIT

39.     On December 18, 2009, DeVaco and his wife Peggy (the "DeVacos") filed a lawsuit against UPS in the Pennsylvania Court of Common Pleas of Philadelphia (the "Underlying Lawsuit"). The DeVacos alleged that UPS was negligent and that they suffered damages for personal injuries and a loss of consortium.   *See* the DeVaco Amended Complaint attached hereto as Exhibit A.

40.     On July 6, 2010, UPS was served the DeVacos' complaint.

## UPS TENDER LETTER DEMANDS DEFENSE AND INDEMNIFICATION FROM ATI

41.     Prior to the DeVaco accident, on August 11, 2005, UPS and ATI executed an agreement that was titled the "Cargo Aircraft Charter Agreement," (the "CACA").   *See* CACA, attached hereto as Exhibit B.

42.     Pursuant to the CACA, ATI agreed to defend and indemnify UPS for any lawsuit arising out of ATI's services; specifically, Section 1.4 provides, in pertinent part, that:

> 1.4 **[ATI] hereby agrees to indemnify, defend, and release and hold harmless UPS** and its officers, directors, agents and employees **against any and all liabilities, claims, demands, suits, judgments, damages and losses, including the reasonable costs, expenses and legal fees in connection therewith or incident thereto, arising out of** death or **injury to any person whomsoever, including but not limited to employees of [ATI]** or UPS, or arising out of loss of, damage to or destruction of any property whatsoever, including but not limited to cargo, the Aircraft and other property of UPS or third parties, **to the extent caused by or arising out of or in any way connected with [ATI]'s performance of services hereunder** or its possession, use or maintenance of Aircraft utilized to provide such services, **excluding however injury or damage caused by the willful misconduct or gross negligence of UPS or its subcontractors**. (Emphasis added).

43.     On July 19, 2010, Holland & Knight tendered UPS' defense of the DeVacos' complaint to ATI—the "first tender." *See* Holland & Knight tender letter dated July 19, 2010 attached hereto as Exhibit C.

44.     In the "first tender," UPS stated that "[b]ecause Mr. DeVaco would not have been on the premises but for ATI's maintenance services, there can be no dispute that the injuries sustained by Mr. DeVaco arose out of or were connected to ATI's maintenance services rendered under the Agreement. These circumstances squarely implicate ATI's defense and indemnity obligations."

45.     ATI neither responded to nor accepted UPS' "first tender."

46.     On September 16, 2010, Holland & Knight sent ATI a "second tender" on behalf of UPS. *See* Holland & Knight tender letter dated September 16, 2010 attached hereto as Exhibit D.

47.     ATI neither responded to nor accepted UPS' "second tender."

48.     On October 8, 2010, Holland & Knight sent ATI a "third tender" on behalf of UPS. *See* Holland & Knight tender letter dated October 8, 2010 attached hereto as Exhibit E.

## ATI RETAINS SALMON, RECCHEZZA,  SINGER AND TURCHI AS COUNSEL AND INVESTIGATES  UPS' TENDER

49.     On September 29, 2010, George Golder ("Golder") a licensed attorney who also acted in the capacity as Vice-President and General Counsel for ATI forwarded the "second tender" to ATI's commercial insurance broker.

50.     On September 30, 2010, the commercial insurance broker sent Golder's email that forwarded UPS "second tender" to ATI's lead insurer, Chartis Aerospace Insurance Group ("Chartis").

51.     Both ATI and Chartis had worked with the Salmon Firm in the past.  Both ATI and Chartis expressed satisfaction with the Salmon firm.

52.     On October 6, 2010, Allen wrote to Salmon stating that Allen had two cases for the Salmon Firm and requested that Salmon run a conflicts check for both cases.  Approximately twenty-five minutes later, Salmon responded to Allen stating that the UPS case was free from conflicts.

53.     Allen then wrote to Golder: "I have asked Salmon, Ricchezza, Singer and Turchi to run a conflict check. I just received word from Jay Salmon that there is no conflict and have retained them as counsel for this matter."

54.     Allen then responded and forwarded Salmon "all the related correspondence."

55.     Approximately twenty-one minutes after receiving "all the related correspondence" from Allen, Salmon wrote to Meyer: "Here's what I have."

56.     After receiving "all the related correspondence" from Salmon, approximately one hour and sixteen minutes later, Meyer prepared and sent the following opinion by email to Salmon:

I reviewed the indemnification clause in the Cargo Aircraft Charter Agreement between UPS and ATI. Article 1.4 contains mutual indemnification agreements which require ATI and UPS to each defend and indemnify the other for bodily injury, specifically including injury to ATI's employees, "to the extent caused by or arising out of or in any way connected with" their respective performance of services under the Agreement or their possession, use or maintenance of Aircraft utilized to provide such services. The clauses exclude indemnification only for injury caused by the indemnitee's willful misconduct or gross negligence.

Because the agreement specifically includes injuries to ATI's employees, ATI would not be protected by Workers Comp immunity. However, the Pennsylvania Supreme Court has held that the "to the extent caused by" language requires indemnification only for the indemnitor's share of responsibility for the plaintiffs injuries, even where the indemnification agreement also purports to provide indemnification for the indemnitee's own negligence. Greer v. City of Phila., 795 A.2d 376 (Pa. 2002). Therefore, a good argument can be made that, at most, ATI would be obligated to indemnify UPS only for ATI'S percentage share of responsibility for plaintiffs damages. Furthermore, because UPS is required to indemnify ATI for injuries caused by UPS' operations under the Agreement, their respective indemnity obligations should cancel each other out. Therefore, I would recommend that ATI decline the tender. [Emphasis added by Meyer.]

57.    On October 12, 2010, Meyer prepared and forwarded to Salmon a memorandum he titled as "Indemnification and Insurance Issues." *See* Philip Meyer memorandum dated October 12, 2010 attached hereto as Exhibit F.

58.    Meyer's memorandum contained the following five opinions:

(a) "Because the indemnification clause specifically includes injuries to ATI's employees, ATI would not be protected by WC immunity."

(b) "At most, ATI would be obligated to indemnify UPS only for ATI's percentage share of responsibility for DeVaco's damages."

(c) "There would be no indemnity obligation if UPS' pilot was guilty of gross negligence."

(d) "Based on limited information in the file, I cannot tell if there is basis for any negligence on the part of ATI."

9

(e) "Therefore, I would recommend that ATI decline the tender at this time."

59.     On October 12, 2010, Meyer, Allen, Salmon and an unknown ATI representative conducted a telephone conference and discussed the "indemnification issue."

60.     On October 19, 2010, Salmon had a conference call with Allen.  Salmon then forwarded the final draft of the "Indemnification and Insurance Issues" memorandum to Golder and Allen.

61.     On October 20, 2010, Golder wrote to Salmon and Allen:

Well done memo. Thanks. We should explore with ATI what UPS actually had to do under the agreement. If they were responsible for allowing ramp access to our guys (as a practical matter, whether stated explicitly in the agreement as their obligation or not), would that give us grounds for claiming that their indemnity applies?

62.     On January 18, 2011, Salmon and Allen met in Philadelphia and conducted a one-hour and a half conference.

63.     The following day, on January 19, 2011, Salmon, Allen, Ballard and two ATI representatives named Brian and Jim conducted a site visit at the Philadelphia International Airport and specifically the UPS Terminal, the UPS Building and the UPS Ramp. They viewed, inspected, photographed and took measurements at the location where the DeVaco accident occurred. They spent approximately five and a half hours conducting the site visit. *See* memorandum dated January 20, 2011 attached hereto as Exhibit G.

64.     On February 10, 2011, Meyer made the following billing entry: "Legal research re: indemnitor's obligation to assume indemnitee's defense where complaint asserts claim that potentially falls beyond scope of indemnity agreement." Meyer billed 3.50 hours for his legal research and memorandum preparation.

65.     The next day, on February 11, 2011, Meyer drafted a letter to Holland & Knight rejecting the "third tender."

66.     On March 14, 2011, Meyer, Allen and Salmon had a half hour telephone conference call to discuss the effect of the indemnification provisions of the CACA.

67.     A few days later, on March 17, 2011, Meyer conducted additional legal research on the indemnification provisions of the CACA but with an emphasis on Kentucky law.

68.     On April 19, 2011, Holland & Knight, on behalf of UPS, made a "fourth tender." *See* Holland & Knight tender letter dated April 19, 2011 attached hereto as Exhibit H.

69.     ATI was aware of the legal advice adverse to UPS' indemnification rights that Salmon, Ballard, Meyer, and the Salmon Firm had provided to both ATI and Chartis.

70.     Allen authorized Salmon to inform UPS of the acceptance of the tender by ATI.

71.     ATI ratified Allen's authorization to Salmon to inform UPS of the acceptance of the tender by ATI.

72.     ATI and Chartis failed to keep UPS informed of the opinions expressed in the Salmon Firm's memoranda, like those contained in the memorandum entitled "Indemnification and Insurance Issues."

## SALMON FIRM/ATI UNCONDITIONALLY ACCEPT UPS' TENDER

73.     On April 25, 2011, Salmon, on behalf of ATI, accepted UPS' tender unconditionally, without any reservation of rights, discussion of conflicts of interest, or disclosure of the opinions expressed by the Salmon firm in the "Indemnification and Insurance Issues" memorandum.

74.     Salmon stated in the acceptance of the UPS' tender only "ATI will undertake the defense of UPS going forward in this litigation."   *See* e-mail from J. Salmon dated April 25, 2011 attached hereto as Exhibit I.

75.     Between the April 25, 2011 date on which ATI accepted UPS' tender and June 22, 2012, neither ATI nor Chartis ever sent UPS a written reservation of rights under the CACA.

76.     Between the April 25, 2011 date on which ATI accepted UPS' tender and June 22, 2012, neither ATI nor Chartis ever communicated to UPS -- whether verbally or in writing -- that they intended to reserve any rights under the CACA.

77.     On May 13, 2011, the Salmon Firm entered its appearance and filed a jury demand on behalf of UPS.

## SALMON FIRM'S DEFENSE OF UPS

78.     For the next fifteen months, from May 13, 2011 to August 15, 2012, the Salmon Firm, Chartis, and ATI were in control of the defense of UPS.

79.     During that fifteen-month period, the Salmon Firm reviewed and produced documents, prepared and deposed witnesses, and was responsible for all other tasks that are involved in the defense of a serious personal injury claim, including the handling of settlement negotiations.

80.     UPS relied upon ATI's unconditional acceptance of their tender, and allowed the Salmon Firm complete control of their defense in the Underlying Lawsuit.

81.     UPS was greatly prejudiced by the inappropriate acts and omissions of the Salmon Firm, on whom UPS relied at all relevant times.

82.     In light of the CACA's gross-negligence exception referenced in their afore-mentioned October 12, 2010, opinions, including the opinion that "[t]here would be no

indemnity obligation if UPS' pilot was guilty of gross negligence," the Salmon Firm handled UPS' defense and reported to ATI and/or Chartis in ways that improperly prejudiced UPS' interests and furthered the interests of ATI and/or Chartis.

83.     Neither ATI nor Chartis disclosed to UPS the extent to which the Salmon Firm had advised ATI and/or Chartis regarding UPS' tender, nor did they disclose to UPS that the Salmon Firm had provided ATI and/or Chartis with the afore-mentioned October 12, 2010, opinions.

84.     On August 3, 2011, the court in the Underlying Lawsuit issued a second and final Case Management Order that established the following deadlines:

> (a) "All discovery on the above matter shall be completed not later than 2 July 2012";
>
> (b) "Plaintiff shall identify and submit curriculum vitae and expert reports of all expert witnesses intended to testify at trial to all other parties not later than 2 July 2012";
>
> (c) "Defendant shall identify and submit curriculum vitae and expert reports of all expert witnesses intended to testify at trial not later than 6 August 2012";
>
> (d) "All pre-trial motions shall be filed not later than 6 August 2012"; and
>
> (e) "It is expected that the case will be ready for trial 5 November 2012, and counsel should anticipate trial to begin expeditiously thereafter."

*See* Case Management Order dated August 3, 2011 attached hereto Exhibit J.

85.     When the court entered the Case Management Order, Ballard attended court as an attorney authorized by the Salmon Firm on behalf of UPS.

86.     Ballard understood that the Case Management Order was the second order entered by the court and that, absent extraordinary circumstances, it would be very difficult to obtain relief from the deadlines prescribed.

87.     On August 4, 2011, Ballard sent an email summarizing additional facts he was told by UPS personnel related to the defense of the case:

    (a) Because DeVaco and Waldron had their own "SIDA" and TSA-approved badges there was no UPS' escort involved in this accident as the ATI "employees would have been able to move throughout the UPS ramp on their own."

    (b) "Subsequently, the ATI van was not parked in a designated parking area."

    (c) "Additionally, ATI administers its own training in ramp safety which Plaintiff would have had to complete."

    (d) "Further, the ATI/UPS contract required that all ATI employees comply with the UPS MX manual, including the safety provision pertaining to jet blast recognition/avoidance and general ramp safety."

    (e) "Therefore, the decision to park the vehicle in the accident location was made by both occupants of the van as no UPS personnel were involved as escorts. No one from UPS assigned that spot for ATI to park."

    (f) "After selecting the parking spot, the two ATI employees went inside the UPS Terminal, only returning to their vehicle when the B747-100 was creating jet wake, the ATI employees got inside the van."

    (g) "Plaintiff, for unexplained reasons, went to the back of the van. He was injured when the truck flipped onto its side and an unsecured nitrogen bottle fell on him."

    (h) "Failure to secure the nitrogen bottle is an OSHA violation in itself."

*See* Ballard's e-mail dated August 4, 2011 attached hereto as Exhibit K.

88.     From May 13, 2011 to July 17, 2012, the Salmon Firm exchanged numerous emails and letters, and had numerous telephone conferences and in-person conferences, with Allen of Chartis and Golder of ATI,.

89.     During this same period of time, Salmon and Ballard also reported to and conferred with ATI.

90.     The communication with Chartis and ATI were unknown, undisclosed, and unreported to UPS.

### THE DECISION TO RESCIND TENDER ACCEPTANCE

91.     In a letter dated June 22, 2012, Salmon provided Chartis an "update regarding the liability picture." *See* Salmon correspondence dated June 22, 2012 attached hereto as Exhibit L.

92.     In the June 22, 2012 correspondence Salmon advised Chartis that "[m]ost of the liability depositions have been conducted and the majority of the testimony has been extremely unfavorable." *Id.*

93.     In Salmon's June 22, 2012 correspondence to Chartis, Salmon failed to disclose several critical facts, including but not limited to:

> (a) DeVaco and Waldron had negligently parked in an area that was in an imminently arriving aircraft's jet blast zone;

> (b) Because DeVaco knew the nitrogen tanks in the truck were not properly secured, he negligently left both the secure area of the UPS Building and the drivers' compartment of the ATI Grumman truck to move the truck away from the jet blast of the UPS 747 and to attempt to secure the nitrogen tanks ;

> (c) That driving the ATI Grumman truck around the UPS' Ramp, as well as the Philadelphia International Airport, with unsecured nitrogen and oxygen tanks was negligent, and certainly a violation of OSHA regulations;

> (d) That ATI failed to provide DeVaco and Waldron a safe method to transport nitrogen tanks that complied with OSHA regulations; and

> (e) The UPS pilot was free of negligence in the operation of the UPS 747.

94.     Salmon's June 22, 2012 correspondence to Chartis failed to take into account DeVaco's comparative fault.

95.     Salmon's June 22, 2012 letter to Chartis failed to disclose that no liability expert had been retained on behalf of UPS.

96.     During the Underlying Lawsuit, Defendants failed to retain or obtain any expert liability opinions on behalf of UPS.

97.     Instead, Salmon's June 22, 2012 correspondence to Chartis painted a one-sided liability picture adverse to UPS by telling ATI's lead insurer Chartis that the evidence of record was "extremely unfavorable" to UPS.

98.     Salmon's June 22, 2012 correspondence to Chartis stated that it was their "opinion that a jury would find UPS liable for Mr. DeVaco's accident" and ignored defenses plainly available to UPS.  The letter concluded that "[a]t this point, it appears that UPS does not have any liability defense available."

99.     UPS was neither contemporaneously informed of the contents of the communication nor informed that Salmon, Ballard, Meyer, Chartis and ATI discussed its subject matter.

100.    On July 17, 2012, 14 months and 23 days after ATI unconditionally accepted UPS' tender without any reservation of rights, Chartis informed UPS that "ATI is not obligated to indemnify the UPS Defendants for the reasons set forth in this letter, and any indemnification concerning this loss should flow from the UPS Defendants to ATI." *See* Letter of July 17, 2012 attached hereto as Exhibit M.

101.    Allen also wrote the following:

> (a) "Moreover, the UPS Defendants level of culpability for the underlying accident is another reason ATI is not obligated to indemnify the UPS Defendants."
>
> (b) "The Agreement states that ATI need not indemnify UPS for its willful acts or gross negligence, and, as set forth previously, there are facts that implicate a higher level of culpability than mere negligence on the part of the UPS Defendants."
>
> (c) "UPS Defendants must take the necessary steps to replace defense counsel within thirty (30) days from the date of this letter."

*Id.*

102.    Chartis reaffirmed the purported revocation of ATI's acceptance of UPS' tender by letter dated August 9, 2012.  *See* letter dated August 9, 2012 attached hereto as Exhibit N.

103.    Upon Chartis' purported revocation, upon information and belief, ATI and/or Chartis refused to give any settlement authority to the Salmon Firm for a mediation that was scheduled for August 2, 2012, and the mediation was cancelled.

104.    By letter dated August 3, 2012, UPS rejected Chartis' purported revocation but, notwithstanding that rejection, by letter dated August 6, 2012 -- 15 months and 13 days after ATI unconditionally accepted UPS' tender without any reservation of rights, and over a month after the expiration of the discovery period in the Underlying Lawsuit -- ATI informed UPS that it was revoking its prior acceptance of their tender.    By letter dated August 22, 2012, UPS rejected ATI's purported revocation.  *See* letters dated August 3, 2012, August 6, 2012, and August 22, 2012 attached hereto as Exhibits O, P and Q.

105.    By letter dated August 10, 2012, the Salmon Firm informed UPS that it had "been advised by Chartis that they will no longer pay for our services after Friday, August 17," and, in turn, that it would file a motion to withdraw as counsel immediately after a court-ordered mandatory August 15, 2012 settlement conference (for which, upon information and belief, ATI and/or its insurer refused to give any settlement authority to the Salmon Firm).  *See* letter dated August 10, 2012 attached hereto as Exhibit R.

106.    Before it withdrew as counsel, in a "Settlement Conference Memorandum" dated August 7, 2012, the Salmon Firm declared that UPS "concede[s] that the activities of its pilots, marshallers and escorts contributed to the occurrence of the accident."  This concession was made without UPS' knowledge or permission.  *See* Settlement Conference Memorandum attached hereto as Exhibit S.

**SETTLEMENT OF THE UNDERLYING LAWSUIT**

107.   After Defendants withdrew as counsel for UPS in the Underlying Lawsuit, UPS was required to engage defense counsel who was unfamiliar with the case developments over the prior 15 months, and incurred attorneys' fees in excess of $172,198.00. The attorney fees and expenses were reasonable and necessary under the circumstances.

108.   On September 15, 2012, at mediation, UPS settled the Underlying Lawsuit for $5,500,000.

**THE DECLARATORY JUDGMENT ACTION**

109.   UPS brought a declaratory judgment action against ATI that was removed to the United States District Court, the Western District of Kentucky at Louisville.  UPS filed a motion to dismiss ATI's amended counterclaim that "UPS indemnify ATI pursuant to the CACA."  On May 17, 2013, Senior Judge Charles R. Simpson, III, filed his written memorandum opinion. *See* Judge Simpson's Memorandum Opinion attached hereto as Exhibit T. Judge Simpson dismissed portions of Count I and the entirety of Count II of ATI's counterclaim, and specifically found that "UPS has no duty under the CACA to indemnify ATI," in that no alleged failure on UPS's part was a "service" that UPS was required to perform under the CACA.

110.   Judge Simpson's ruling has become the law of the case.

**COUNT I**
**PROFESSIONAL NEGLIGENCE/LEGAL MALPRACTICE**

111.   UPS incorporates all prior paragraphs as if set forth herein fully at length.

112.   On or before May 13, 2011, the Salmon Firm entered into an attorney client relationship with UPS, when the Salmon Firm entered its appearance on behalf of UPS.

113.    At all times material hereto, Defendants owed UPS the exercise of ordinary skill and knowledge of attorneys in Pennsylvania.

114.    Defendants' conduct in the Underlying Lawsuit, both individually and collectively, breached their duties owed to UPS by their acts or their failures to act, which include, but are not limited to:

    (a) Failure to investigate, develop and preserve the following evidence prior to the discovery deadline of July 2, 2012:

        i.   Identify and preserve the evidence of the ATI Grumman truck;

        ii.  Identify and preserve the evidence of the interior of the ATI Grumman truck to include the lack of seats, seatbelts, the equipment racks, the amount of room to stand in, the visibility to the outside from the interior of the truck, and the nitrogen securing clamps;

        iii. Examine, identify and preserve the evidence of the nitrogen and oxygen tank securing clamps to determine if they were either defectively manufactured or improperly used by DeVaco;

        iv.  Identify and preserve the evidence of the nitrogen and oxygen tanks that injured DeVaco;

        v.   Identify and preserve the evidence of the nitrogen tank value that caused the nitrogen release;

        vi.  Identify and preserve the evidence of the ATI aircraft that DeVaco and Waldron were waiting to perform maintenance on December 21, 2011;

        vii. Identify and preserve evidence of when the nitrogen tanks were filled and transferred to the ATI maintenance facility for loading into the ATI Grumman truck;

        viii. Identify and preserve evidence that impeached the deposition testimony of DeVaco and Waldron at trial; and

        ix.  Identify and preserve evidence of ATI's failure to provide DeVaco and Waldron, as well as other ATI mechanics, a safe and proper method that complied with OSHA regulations for transporting nitrogen tanks at the Philadelphia airport.

(b) Failure to investigate, develop and advance evidence of DeVaco's comparative negligence prior to July 2, 2012, to include the following:

    i.  DeVaco's decision to run to his vehicle as the UPS 747 taxied as described by witnesses and recorded in Salmon's letter to Chartis on October 11, 2011;

    ii.  DeVaco's decision to park the ATI Grumman truck in an open and obvious jet blast zone;

    iii.  DeVaco's decision to stay in the ATI Grumman truck when the UPS 747 was approaching knowing that the ATI Grumman truck was in an open and obvious jet blast zone;

    iv.  DeVaco's decision to stay in the rear area of the ATI Grumman truck instead of sitting next to Waldron in the passenger seat in the front area of the ATI Grumman truck while the UPS 747 approached;

    v.  DeVaco's decision to stay in the rear area of the ATI Grumman truck knowing that the rear area did not have a seat or seatbelts, that DeVaco would be standing in the middle of the ATI Grumman truck surrounded by unsecured nitrogen and oxygen tanks while the UPS 747 approached; and

    vi.  DeVaco's failure to properly secure the nitrogen and oxygen tanks.

(c) Failure to investigate, develop and preserve testimony of ATI employees, other than DeVaco and Waldron, prior to July 2, 2012, that would have supported a comparative negligence liability opinion from expert on liability;

(d) Failure to prepare UPS witnesses for their depositions;

(e) Failure to retain experts and identify and submit curriculum vitae and expert reports of all expert witnesses intended to testify at trial by August 6, 2012; and

(f) Failure to file pre-trial motions prior to August 6, 2012.

115. The aforesaid negligent acts of Defendants directly and proximately caused UPS to engage defense counsel who was unfamiliar with the case developments over the prior 15 months, and incurred attorneys' fees in excess of $172,198.00.

116.    The aforesaid negligent acts of Defendants directly and proximately caused UPS to settle the Underlying Lawsuit for the amount of $5,500,000, a sum in excess of that amount justified by the discoverable evidence.

117.    But for the Defendants' negligent conduct, UPS' defense, had the evidence been properly marshaled, was substantially and materially stronger than advanced by Defendants.    Possessed of the properly developed evidence, UPS would not have settled the Underlying Lawsuit, would have tried the lawsuit to verdict and would have received a "not liable" verdict, or would have settled the lawsuit for an amount far less than the settlement amount.

WHEREFORE, UPS requests judgment in its favor and against all Defendants, jointly and severally, in an amount sufficient to compensate UPS and in excess of Seventy Five Thousand Dollars ($75,000) plus interest, costs, and such other relief as the Court deems just.

## COUNT II
## BREACH OF FIDUCIARY DUTY

118.    UPS incorporates all prior paragraphs as if set forth herein fully at length.

119.    At all times material hereto, Defendants had a fiduciary duty to represent and protect UPS during the course of the Underlying Lawsuit.

120.    At all times material hereto, Defendants had a fiduciary duty of undivided loyalty that prohibited them from engaging in conflicts of interest.

121.    At all times material hereto, Defendants knew that UPS' interests were adverse to ATI and/or Chartis.

122.    Defendants, from the first moment of representation to their withdrawal, never disclosed to UPS the following:

(a) Salmon, Ballard and Meyer concurrently represented and advised UPS and ATI and Chartis;

(b) Salmon, Ballard and Meyer had advised Chartis and ATI that they should decline the tender by UPS of the Underlying Lawsuit;

(c) Salmon, Ballard and Meyer had advised Chartis and ATI that "[t]here would be no indemnity obligation if UPS' pilot was guilty of gross negligence";

(d) Salmon, Ballard and Meyer had advised Chartis and ATI that ATI would be obligated to indemnify UPS only for ATI's percentage share of responsibility for DeVaco's damages and that there was no basis for any negligence on the part of ATI with the end result being that ATI had no indemnity obligation to UPS;

(e) Salmon, Ballard and Meyer sent correspondence, including letters and emails, to both Chartis and ATI without UPS' authorization or disclosure to UPS;

(f) Salmon, Ballard and Meyer conducted conferences, telephonic, electronic and in person, with both Chartis and ATI without UPS' authorization or disclosure to UPS;

(g) Salmon, Ballard and Meyer provided legal advice to Chartis and ATI that was materially adverse to UPS;

(h) Salmon, Ballard and Meyer conferred with Chartis and ATI and determined how and to what extent UPS should be defended in the Underlying Lawsuit; and

(i) Salmon, Ballard and Meyer withdrew from representing UPS after the discovery deadlines and expert liability disclosure deadlines;

123.   But for the Defendants' breach of fiduciary duties, UPS' defense, had the evidence been properly marshaled, would have been substantially and materially stronger than advanced by Defendants.   Possessed of the properly developed evidence, UPS would not have settled the Underlying Lawsuit, would have tried the lawsuit to verdict and would have received a "not liable" verdict, or would have settled the lawsuit for an amount for less than the settlement amount.

124.   Defendants either actually knew or should have known that their conduct posed a risk of harm to UPS, and that it was highly probable that harm would follow.

125.    In addition to compensatory damages, UPS is entitled to punitive damages as a result of Defendants' outrageous conduct.

126.    As a direct and proximate cause of the breaches of fiduciary duty owed by Salmon, Ballard and Meyer to UPS, UPS has incurred attorney fees and expenses in prosecuting this action, the declaratory judgment action in Kentucky, and have incurred greater operating expenses, to include insurance premiums.

127.    As a result of Defendants' breaches of fiduciary duty, Defendants proximately caused UPS damages in excess of $5,500,000 plus defense costs.

128.    Additionally, as a result of Defendants' breaches of fiduciary duty, UPS was required to engage defense counsel who was unfamiliar with the case developments over the prior 15 months, and incurred attorneys' fees in excess of $172,198.00; The attorney fees and expenses were reasonable and necessary under the circumstances.

129.    But for Defendants' conduct, UPS would not have been forced to settle the Underlying Lawsuit and would not have incurred significant fees and costs to mitigate the harm caused to them.

WHEREFORE, UPS requests judgment in their favor and against all Defendants, jointly and severally, in an amount sufficient to compensate UPS and in excess of Seventy Five Thousand Dollars ($75,000) plus interest, costs, and such other relief as the Court deems just.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury for each and every issue so permitted by law and statute.

Respectfully submitted,

**SPELLMIRE GRASSO BASS**

George W. Spellmire
Gary A. Grasso
Willis Tower
233 South Wacker Drive, Suite 2100
Chicago, Illinois 60606
Telephone:      (312) 258-9400
Facsimile:      (312) 258-9444
E-mail:         gws@spellmirelaw.com
E-mail:         ggrasso@grassolaw.com

*To Be Admitted Pro Hac Vice As Counsel
For Plaintiffs*

Dated:   June 21, 2013

**KEENAN COHEN & HOWARD, P.C.**

s/ Christopher J. Merrick
Christopher J. Merrick (Pa. Bar I.D. No 208628)
One Pitcairn Place, Suite 2400
165 Township Line Road,
Jenkintown, PA 19046
Telephone:      (215) 609-1110
Facsimile:      (215) 609-1117
E-mail:         cmerrick@freightlaw.net

*Local Counsel of Record for Plaintiffs*